First case this morning is Bob Brightwell v. Joseph Lehman. And counsel for the petitioner, Mr. Nanaka. Good morning, and may it please the court. My name is Michael Nanaka, and I represent the appellant, Mr. Bob Brightwell. With the court's permission, I'd like to request two minutes in rebuttal time. Great. Your Honors, this case arises under the Tebron v. Grace line of cases involving a civil plaintiff's request for counsel under Section 1915 of Title 28 of the U.S. Code. I'm sorry to cut you off so quickly, but before we get into the Tebron factors, isn't there a threshold you need to satisfy? Why is your client entitled to the appointment of counsel under Section 1915? Your Honor, you're correct. There is a threshold standard under Tebron whereby a civil plaintiff must set forth a prima facie case, and they must also demonstrate more than an extremely thin chance of success on the merits. No, I'm going even one step prior to that. As I understand it, you're saying your client should have been appointed counsel under Section 1915. Is that correct? That's correct. All right. As I also understand it, your client had three strikes. That's also correct. All right. And as I read Section 1915G, it prohibits your client from proceeding under Section 1915 by virtue of his three strikes. Is that correct? That is not correct, sir. We would disagree for several reasons. The first reason is that this circuit has never had a case whereby they concluded that 1915G bared on the ability to appoint counsel under 1915E, and then also a plain reading of the text of Section 1915E does not support that interpretation either. In fact, Section 1915E simply refers that any person unable to afford counsel may have counsel appointed for them. And Section 1915, in fact, contains numerous cross-references. If you look at Section 1915B, it refers to 1915A, and so if Congress had intended for the three strikes provision to apply to the appointment of counsel under 1915E, then it easily could have said so. Well, but it says that under G that your client cannot proceed under this section. What does the word section refer to? The word section refers to the 1915A filing fee that must be paid in order to proceed. Isn't 1915A a subsection, and section refers to 1915? That's correct. And if 1915G had applied to 1915E, then 1915E easily could have read any person may be appointing counsel if they cannot afford it unless they have three strikes. And in addition, this Court has recognized the difference between proceeding in form of papyrus as to the filing fees versus in form of papyrus as to the appointment of counsel. That's why I'm standing here. Your Honors appointed me by an order, and as a condition to that order granted a motion to proceed in form of papyrus, recognizing that the two in form of papyrus as to the filing fee and counsel are different. And we would submit moreover that Congress's intent would not have been to bind the Court and prohibit it from appointing counsel simply because the plaintiff had three strikes. In that regard, you could lead to a very complicated record and basically have the same problems that we have with this case. We would suggest that there are three important elements to Mr. Brightwell's motions to request counsel. First, the District Court did not adequately address either the Tebron standard or the Tebron factors. Second, Mr. Brightwell's motions to request counsel, in fact, satisfy the Tebron threshold standard, and a careful weighing of the factors also supports counsel for him. And then third, Mr. Brightwell was put in a catch-22 of sorts after the District Court denied his motions to request counsel and then in summary judgment considered his inability to adduce expert medical testimony to be dispositive of his claims. The District Court's orders, considering Mr. Brightwell's motions for counsel, did not address the Tebron threshold standard or weigh the Tebron factors. Judge Sensenich's order simply wrote denied on Mr. Brightwell's motion and referred to a report and recommendation dated October 30, 2003. And Judge Lenihan's orders noted the shortage of pro bono counsel and then gave Mr. Brightwell the opportunity to refile his motions after the completion of summary judgment. Judge Gibson's order, in which he affirmed Judge Lenihan's first order denying counsel, affirmed Judge Lenihan's reasoning and then also noted that discovery in the case was not yet complete and that after the completion of discovery the judges would be in a better position to assess the need for counsel. And in none of these orders did the judges address the Tebron threshold standard or the Tebron factors. And we would suggest that Judge Lenihan's reasoning in simply noting the shortage of pro bono counsel and then deferring in some sense a determination, as in Mr. Brightwell's motions, has dangerous implications for the Tebron standard itself. What are the dangerous implications? The dangerous implications is that the Tebron factors that involve the need for discovery, such as the plaintiff's ability to present his case and the need for factual discovery and factual determinations won't be given their due accord if counsel is not available during pre-summary judgment discovery. Because that time, as you know, is when many cases live or die and if those factors are not given their due consideration until after summary judgment, then the motion to appoint counsel won't be fully considered. We would also argue that the shortage of pro bono counsel, while it certainly is a consideration for the courts to weigh, it doesn't rise to the level of a Tebron factor, and there are good reasons for that. The Tebron framework and factors itself will serve as a gatekeeping function and will preserve the supply of pro bono attorneys for only those cases that are the most deserving. Suppose we agree with you on the counsel issue. What relief would that lead to? What remedy would you seek as a result? We would request a remand to the district court with the instruction that counsel be appointed and the record be reopened for further discovery. Should not there be a Tebron hearing for the court to consider whether counsel should be appointed? Why should we be in the position of ordering the appointment of counsel? I think at this point a remand with a hearing on Tebron would at the very least be what this court should do, but we feel strong enough that the Tebron analysis, including the threshold standard as well as the factors, actually weighs in our favor. As to the Tebron threshold standard, which requires that Mr. Brightwell show not only a prima facie case, but that he also demonstrate more than an extremely thin chance of success and the merits, we feel strongly that he's met that test. What's your best claim in response to the extremely thin issue that you just raised? The best response is that Mr. Brightwell had a foreign object lodged in his right eye due to a botched cataract surgery in 1999. Tell me about this because I don't understand it. As I understand the surgery, there is a membrane that is basically pulled away or to be removed so that vision improves. Is it your claim that there was actually a foreign object introduced into Mr. Brightwell's eye or that part of the membrane that should have been removed, in fact, was left in as a result of the surgery? Our contention would be that an object, whether it be a foreign object that was necessary as part of the surgery or part of the capsule, remains in his eye in a foreign place in such that it is causing headaches and also vision problems. What evidence is there in the record that it's a foreign object and not part of the membrane that you claim should have been pulled away? Unfortunately, the record is admittedly incomplete because counsel was not appointed at the time to explore issues such as this very good one that Your Honor points out. Why can only counsel explore that? I mean, there are people at Liberty who claim that they have med mal cases and if they can't get a lawyer to take the case and they don't have the money, they're in a similar situation as Mr. Brightwell, aren't they? They would be, Your Honor, yes. In this case, however, Mr. Brightwell's deliberate indifference claims required an attorney insofar as a medical expert would have been ultimately required. I guess that's my question. Why does one need a lawyer to get a medical expert? One can get a medical expert. I mean, Brightwell's family or his friends could have hired a doctor to go to the prison and examine him and do a little report. That would at least give us some proffer of evidence apart from what we have now, which as far as I can tell is simply Mr. Brightwell saying there's a foreign object in my eye. I'm not aware if Mr. Brightwell's friends or family would have been in a position to hire a medical expert in that case. In fact, that's one of the Tebron factors that is to be weighed. So we should treat somebody who's at liberty in a worse way than we treat somebody who's incarcerated, who's faced with the same situation as Mr. Brightwell? No, I think that you have to treat Mr. Brightwell fairly in a way that gives him the opportunity, if he has a merit-worthy claim, to have counsel sort through those claims and to get medical expert testimony. Well, let's go right back to the facts for a moment. You do not claim that the follow-up care was faulty, do you? No, we do not, Your Honor. All right. So I think you used the word botched a few minutes ago with regard to the surgery. That's correct, with respect to the 1999 surgery. You'd agree that botched in this context most closely equates to negligence and not medical indifference? I would suggest that the surgery itself could be botched in a way that led to a circumstance that, if not remedied, was deliberate indifference. But those aren't the facts that we have here, are they? Well, I think we would argue that Mr. Brightwell submitted numerous grievances to the appellees as to the foreign object in his eye, that he received responses to those grievances, and that no immediate follow-up surgery was performed. Wasn't it the medical expert, the doctors, subsequent to April of 2005, wasn't it their view that follow-up surgery wasn't necessary? Their view was that bifocal lenses would be sufficient to remedy Mr. Brightwell's condition. And Mr. Brightwell was experiencing pain that far surpassed any bifocals being able to remedy that. Or at least he should try the bifocals. I'm sorry? At least he should have tried the bifocals, should he not have? I have nothing in the record to suggest that he did not at any point try on the bifocals, but I know that he continued to experience pain after that recommendation. And, in fact, whether or not he used the bifocals is a good example of where one of the Tebron factors supports Mr. Brightwell, because one of the factors is the extent to which a case turns on Credibility of whom? I'm sorry? Credibility of whom? The credibility of the parties and the credibility of their allegations. And so Mr. Brightwell was contending that the foreign object was causing far more pain in his eye than the treatment that was afforded him by the appellees. But now you're back to Judge Hardiman's point of who's the onus on with regard to presenting expert testimony to counter whatever conclusions the doctors who performed the surgery and who did the follow-up care did, because if there isn't any medical expert testimony, which you don't need a lawyer for, then how is he going to counter or establish, I should say, the notion that the pain that he's enduring is a result of the membrane or the surgery in general? May I respond? Yes. This Court has recognized that expert medical testimony is connected in many ways to the request for counsel, and it's recognized that in the Tebron v. Grace case itself as well as in other cases applying Tebron. Thank you, Mr. Nanaka. We'll hear you back on rebuttal. Mr. Marichle. Good morning, Your Honors. May it please the Court. My name is Kamal Alexander Marichle. I represent the Department of Corrections at Peleze. In this case, my colleague, Ms. Katie Kenyon, represents Physician's Assistant Rush, and we'll be presenting a separate argument. Have you allocated your time? We have, Your Honor. I have requested 10 minutes and reserved five for my colleague. Very well. Thank you, Your Honor. Our first point, which, as the Court knows, we raised in a Rule 28J letter, is that, in fact, Mr. Breitfeld was not even eligible for consideration of appointment of counsel. You don't want us to follow an unpublished Northern District of Illinois case. You want us to follow the 2007 Seventh Circuit case? I didn't understand. Well, if you read the Seventh Circuit case, Your Honor, I feel you as well would agree with me that it merely suggests that the Southern District of Illinois case is the appropriate response. The Seventh Circuit case does not specifically hold, as the Southern District of Illinois case holds, specifically Hairston v. Blackman, on the point. The specific language is in the District Court case, but it is an Article III judge. And I think the more important point is it's the right thing to do. It makes sense. It's good law. Wherever its provenance, we should, in fact, take a look at it and see how well it stands on its own two feet. Obviously, this Court has far greater dignity and power to make the law of the United States than a trial judge sitting in the Southern District of Illinois. I'm not upset that it's a trial judge. It's an unpublished decision. Yes, that's another point. But trial judges often exhibit vast wisdom. I'm sure we would all agree. But there's also an unpublished opinion, and may I remark in the highest traditions of the bar on Mr. Nanaka's professionalism in presenting it himself when I had failed to find it, which is an unpublished decision of this Court, the Goud v. Rector decision, which is in his response to my Rule 28J letter. Now, in that case, as I recall, it is not specifically on point in that the informed papyrus determination does not involve a prisoner. It involves an individual who was informed papyrus in a Title VII ADEA, no, not a Title VII, an ADEA FMLA case. All right, well, I think we all agree, Mr. Nanaka will correct me if I'm wrong, but I think we all agree there's precious little law out there interpreting this particular issue. But it is a question of statutory interpretation. Yes, Your Honor. Let me ask you the same question I asked Mr. Nanaka. When 1915G says that a prisoner with three strikes cannot proceed under this section, to what does the word section refer? It has to refer to Section 1915. All right. That's the section. So if he can't proceed under 1915, then it's your point that he can't get counsel under 1915E or A or B or any other provision. Correct. Is there any other place in the United States Code or in the equitable powers of this court where we might choose to appoint counsel independent of 1915? Your Honors, he anticipated my next point. One of the things that Mr. Nanaka said implied that the courts would not be able to appoint counsel. The courts have every right to ask an officer of the court to volunteer his or her services to assist them in the dispatch of their business. I'm sure that they can request a volunteer to represent an individual, and that person can, in fact, recover attorney's fees if they are able to prevail in the case, just as in an appointment under 19E. What we're talking about here is the right of an individual like Bob Brightwell to complain subject to an abuse of discretion standard when the court decides not to do that. And let's also remember that when we're talking about appointment under 1915E1, we're not actually, it's a quasi-appointment. I think it's easier to talk about it calling it an appointment. But actually what it really is, as we all know, is a request to the members of the bar or a particular member of the bar to volunteer to represent this individual. And that is what we're talking about in this particular instance. The difference between a situation where the court asks someone to do that and the issue we have here today is whether or not if the court does not do that or rejects a motion by Mr. Brightwell or someone in his situation to do that. We know under Tabern versus Grace that that ruling, that failure to appoint, so to speak, is subject to an abuse of discretion standard. And there have been cases, Montgomery versus Pinchin, Parham versus Johnson, which actually reversed even full trials because of an abuse of discretion and a failure to appoint counsel. You can still appoint counsel. Any Article III judge can appoint counsel in the sense of requesting someone to represent an indigent if he or she wants it. Why are you so sure of that? What gives the courts of the United States the right to require a lawyer to represent somebody in a case without compensation? Candidly, the courts of the United States have no right, except in cases such as Body versus Connecticut involving certain fundamental rights, to compel an attorney, the appointment of an attorney and the payment out of public funds. Well, saying a litigant is entitled to counsel as a matter of constitutional right is different, is it not, than the court saying we think it's a good idea in this particular case and we're going to appoint counsel? Yes, and I think if you look at your court's opinion in Tabern versus Grace, that's what it wrestles with, the fact that there really isn't a constitutional right, but statutes may give litigants in form of papyrus the right to move for the court to request the appointment of counsel. I assure you, every member of the bar takes it quite seriously if an Article III judge requests him or her to consider entering a case on behalf of an individual. So that's a very important right, so to speak, that's conferred by statute and case law. And it used to be Section 1915D, now it's Section 1915A1. The point is, particularly when you look at the Prison Litigation Relief Act, it simply would make no sense to say that, and it's actually a term of art, a frequent flyer, so to speak, like Mr. Brightwell, who's been denied the opportunity to proceed in court without the payment of a filing fee and installments, nevertheless should have the ability to call upon the court subject to appellate review for its assistance in getting him a lawyer, which is the most important aspect, as far as I can see, going back to Gideon versus Wainwright, of a right to counsel in any particular context. It just seems paradoxical under the circumstances. And as I think the statutory language indicates, subsection G doesn't mean anything. So when it says this section, it doesn't mean anything other than what it conveys itself about the three strikes rule. Let's change subjects for a moment. Certainly. I want to move to this post-April 2005 point in time. What evidence is there of any failure to address Mr. Brightwell's post-surgery condition? Well, there's a great deal of evidence, particularly in his amended complaint, that he was under the treatment of medical professionals with whose treatment suggestions he disagreed. Other than the bifocals, what is the matter of record as to his disagreement? Other than the bifocals, there really isn't any. He continued to complain until eventually, and the records are attached to my colleague's summary judgment in detail, eventually through 2004, apparently, according to the vision professionals, his situation matured to the point where it seemed that further surgery was the appropriate response, and then there was further surgery. What I want to emphasize briefly in this respect before I leave the podium, if I may, is that this is not a case like Montgomery v. Pinchek or Parham v. Johnson, where we have individuals who aren't medical professionals, and none of my clients are medical professionals, who are looking at a situation where somebody's been told they have to have a cardiac catheterization, they have to have a back operation, there's blood and pus running out of his ear, and the medicine bottle itself says he shouldn't be putting it in his ear. And somebody's just deliberately indifferent to all of these complaints and all of these representations. Here we have a situation where we have a man who is, in fact, complaining that he thinks he's suffered medical malpractice, which is not a constitutional indignity. Thank you, Mr. Murchley. Thank you. Ms. Kenyon. Good morning, Your Honors. I apologize, I'm recovering from a bit of a cold, so please bear with me. Picking up on my colleague's point, I think a fundamental aspect of Mr. Brightwell's claims that has not yet been addressed is that with the record before this court and that was before the district court, the filings provide absolutely no reason to believe that counsel could have obtained any different results. Looking at the medical and the grievance records, which are truly the only records, the only exhibits that would have been at issue in this case, they do not rise to the level of deliberate indifference. This is not a case of medical malpractice. This is a case in which Mr. Brightwell is obligated to prove both components of the deliberate indifference test, must establish a subjective intent, and in reviewing the medical records, it's clear that Mr. Brightwell was sent for repeated care, repeated treatment, repeated examinations, sent to outside specialists. He chose, he made the decision himself, not to wear the bifocals. He might have had headaches due to sinusitis, which I can extremely relate to this morning. He chose not to take his medications. He chose not even to go to clinics that were available to him. Because in his view, he's got something in his eye. What are bifocals going to do to help him if he has something in his eye? Well, an outside specialist, a physician who is trained in eye care and not within the correctional healthcare setting, looked at his eyes, examined him, and said, wear the bifocals. You don't need surgery at this point. Well, but an optometrist in the record indicated that Brightwell needs surgery, right? Several months, if not years later, the surgery was recommended. In March 2005, the consult visit was approved. He had the follow-up visit in April 2005. He had cataract surgery in early May 2005. I'm not sure he could get that speedy service outside a correctional healthcare setting. So as soon as a specialist, a professional, finds that Mr. Brightwell was needy for surgery, it was approved, and he had the surgery. As to physician's assistance... What's the post-surgery issue, this capsule that is referred to? What's the medical evidence that there is no capsule, that it's membrane or... The only evidence that I could see, and I inherited this case somewhat late in the proceedings, was that it's Mr. Brightwell's belief in his thoughts that there was some foreign object left behind that caused him this pain, these headaches, a blurred vision. However, it was a judgment call made by the medical professionals treating him, both within and outside the correctional healthcare setting, that the vision problems, the headaches he was having, were attributable to other causes, i.e. not wearing the bifocals, sinusitis, not taking medications. The record has not been developed as to what exactly occurred in that 1999 surgery and what happened afterwards, other than Mr. Brightwell's belief, his perception of what happened, which has been contradicted by the extent of the medical records. But all of the ophthalmologists and optometrists and others who examined him, there's been no evidence, at least in this record, that there's any foreign object in his eye, is that correct? That's my understanding, Your Honor. There's been a lot of focus on the eye surgery that certainly seems to be the crux of Mr. Brightwell's claims. However, he also has a claim of retaliation as to Physician Assistant Rush. Physician Assistant Rush is just that, a physician's assistant. He is not empowered to solely independently prescribe medications, refer or recommend surgery. His every step needs to be signed off on, approved by a physician. And there is no supervising physician identified as a defendant in this case. There is an allegation that Physician Assistant Rush ignored Mr. Brightwell on May 7, 2004, when Mr. Brightwell was allegedly having a diabetic attack. However, if you look at the grievance records that were attached to Mr. Brightwell's complaint, there is a notation that PA Rush, who was there on the scene for another matter, did examine Mr. Brightwell, did not ignore him, did not reject him, but rather did provide treatment, and Mr. Brightwell was simply dissatisfied with the extent of the treatment provided. That same dissatisfaction is really the crux of his deliberate indifference claim with regard to the eye surgery as well. The last component of Mr. Brightwell's claims as Physician Assistant Rush is this diabetic diet. However, reading the amended complaints, there is simply no allegation that Physician Assistant Rush had anything to do with the diet. And the record is quite clear that Mr. Brightwell was receiving the healthy heart diet, which was a diabetic-approved diet, and that Mr. Brightwell suffered no injury as a result. So I know that there's been a lot of emphasis on the procedural aspect of this, but I think in order to evaluate whether or not counsel was warranted, I think that review of the factual record is necessary as well because it simply shows that even if counsel had been appointed, there simply would have been no difference in the outcome of this case, which was summary judgment in favor of all of the appellees. Thank you, Ms. Kinney. Rebuttal, Mr. Nanaka? Thank you, Your Honor. I'll take a few moments to make a point on Goud. Goud was an unpublished decision, and it did not address the three strikes issue. It only addressed, it only had language that said that a motion to proceed in form of paupers was a condition to the appointment of counsel under 1915E. And in terms of 1915G, 1915G has its own operative effect in that it says that an inmate cannot institute a suit or appeal a judgment. So it's not the case that 1915G does not have its own operative force. It doesn't rely on the other provisions for its effect. And the appellees' counsel argues that simply because Mr. Brightwell was under the care of a medical professional, that the non-medical professional appellees can be insulated from liability. And that's not the approach that this Court has taken, for example, in which the Court held that a non-medical prison official can be held liable if they know or if they have reason to know that the medical professional is not providing adequate treatment. And we would suggest that Mr. Brightwell's submission of numerous grievances, the responses that he received suggesting that bifocals were an adequate remedy for the pain that he was experiencing as well as the headaches and the vision problems. As to the deliberate indifference standard itself, counsel points out that there's an objective and a subjective prong. The objective prong here is clearly met in that the serious medical need to which he's complaining involves an object in his right eye, and that he's continuing to experience pain as a result of that. And we would suggest that that meets deliberately the objective prong in that a lay person would recognize the need for medical treatment in connection with such a condition. And as to the subjective prong, which counsel spends a fair amount of time on, we would suggest that it's also met because the appellees had numerous opportunities to respond to Mr. Brightwell's grievances. Thank you, Mr. Nanaka. I want to thank all counsel for the outstanding briefing and oral argument, and particularly thank Mr. Nanaka for accepting the appointment, and the court's grateful to him and his law firm. Thank you.